

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-21-00122-CV

_____

IN THE INTEREST OF G.Z., A.Z., H.Z., A.Z., A.Z., AND J.D.

---

On Appeal from the 322nd District Court
Tarrant County, Texas
Trial Court No. 322-682567-20

---

Before Sudderth, C.J.; Kerr and Womack, JJ.
Memorandum Opinion by Justice Womack

# MEMORANDUM OPINION

## I. INTRODUCTION

Appellants F.S. (Mother) and H.R.Z.D. (Father) appeal the trial court's judgment terminating their respective rights to three of their children—A.Z. (Amber), A.Z. (Aubrey), and J.D. (Joey).[1]  In this ultra-accelerated appeal,[2] Mother argues in two issues that the trial court abused its discretion by denying her motion for continuance filed two days before trial and that there was "no evidence or insufficient evidence to support the court's finding that termination was in the best interest" of the three children.  In one issue, Father argues that the "evidence was factually and legally insufficient to support the court's finding that termination of [Father's] parental rights was in the best interest of the children."  We will affirm.

## II. BACKGROUND

### A. Investigation and Removal

Mother and Father have six children: G.Z. (Gabby), A.Z. (Alex), H.Z. (Harry), Amber, Aubrey, and Joey.  Gabby, Alex, and Harry are Mother and Father's three

---

[1]We use aliases to identify the children, and we identify family members by their relation to the children.  *See* Tex. Fam. Code Ann. § 109.002(d); Tex. R. App. P. 9.8(b)(2).

[2]*See* Tex. R. Jud. Admin. 6.2(a), *reprinted in* Tex. Gov't Code Ann., tit. 2, subtit. F app. (requiring appellate court to dispose of appeal from judgment terminating parental rights, so far as reasonably possible, within 180 days after notice of appeal is filed).

oldest children.[3]  Amber, Aubrey, and Joey are Mother and Father's three youngest children.[4]

On April 15, 2020, the Department of Family and Protective Services became involved when Mother set a room of her house on fire while her children were in the house and while she was pregnant with Joey.  According to Kimara Burnside, a Department investigator who met with Mother at John Peter Smith Hospital after the fire, Mother told Burnside that "she was being physically abused by [Father]" and that she had started the fire because "she was having some issues with [Father] and . . . was tired and that she wanted to basically die."[5]  Burnside also met with the children who reported that they had heard Mother and Father "arguing and screaming," that Mother had set the room on fire, and that the smoke detectors went off.

Mother was "lat[e] term" pregnant with Joey at the time of the fire, and she admitted to Burnside that she was a user of cocaine and methamphetamine and that she had used methamphetamine the previous month.  On April 17, 2020, Mother gave birth to Joey.  Mother tested positive for amphetamines while in the hospital,

---

[3]At the time of trial, Gabby was seventeen years old, Alex was sixteen, and Harry was fourteen.

[4]At the time of trial, Amber was eleven, Aubrey was eight, and Joey was eleven months old.

[5]Burnside testified that bruises were observed on Mother when she was being transported to the hospital.

and Joey's meconium tested positive for amphetamines and methamphetamines.[6] A few days after Joey's birth, Burnside met with Mother again and discussed the Department's allegations against her, went over a safety plan with her, and informed her that she would not be able to take Joey home because of the positive drug test results.

Through her investigation, Burnside learned that Mother had no prenatal care and that Mother met the criteria to transfer for inpatient psychiatric care. On May 27, Amber tested positive for amphetamines and methamphetamines. Near that same time, Joey again tested positive for amphetamines and methamphetamines. Because of these issues, the children were removed from Mother's care, remained with Father, and Mother began to live with her cousin (Second Cousin) "who also was going to supervise [Mother] with her children during [visitations]."

During this time, Mother alleged that Father was using drugs. Although Father showed up for drug testing once, after he learned it was both a hair and urine test, he left without taking the test. Mother also alleged that she had had a recent altercation with Father and that he had broken her phone during the altercation. Burnside learned that Mother and Father had a prior history of "multiple cases" with the Department. She also learned that Father had a prior conviction for assault causing bodily injury to a family member. Because both parents appeared to be using drugs,

---

[6]As Joey's medical records explain, meconium is an infant's earliest stool that "begins to form between the 12th and 16th week of gestation."

because Mother was experiencing suicidal ideations in the children's presence, and because of ongoing domestic violence, the children were removed from Father's care and placed in a temporary home.

On May 21, 2020, the Department sued for conservatorship of all six children and to terminate both Mother's and Father's parental rights to them. On May 29, 2020, the trial court signed an order appointing the Department as the children's temporary managing conservator. By the time of trial, the three youngest children were living in a foster home, while the three oldest children were living in a general residential child-care facility.

## B. Mother's Pretrial Motion for Continuance

Two days prior to trial, Mother filed a motion for continuance. In her motion, Mother argued that she needed more time to complete her services and to explore placement of the children with Mother's sister (Aunt) in California.

The trial court heard Mother's motion for continuance on the morning of the first day of trial. Mother and Aunt testified at the hearing. Mother said that at the time of trial she was attending counseling and parenting classes. Mother identified two individuals—Aunt and Great Aunt—with whom she wanted to seek the children's placement while she attempted to complete her services. Both Aunt and Great Aunt lived in California. According to Mother, Aunt had begun taking classes to become a certified placement for the children, but Aunt had experienced delays in seeking certification because of COVID pandemic lockdowns. Mother claimed that

she had identified Aunt as a placement for the Department since the beginning of the case but that she "never heard anything" from the Department.

Aunt testified that she had been contacted by the Department shortly after the children were removed. By Aunt's account, the Department informed her that she "was going to be put last" because of a prior felony related to drug trafficking and that California's Department of Interstate Compact on the Placement of Children (ICPC) had not begun the process of determining if she was a proper placement for the children.

Aunt said that she lived in a two-bedroom apartment that housed three people. She explained that she had talked to someone at ICPC and that she knew she would have to move depending on how many children might be placed with her. She admitted that a prior Department caseworker had requested a childcare budget, but she did not provide one.

The trial court denied Mother's continuance motion, and a two-day bench-trial ensued.[7]

## C. The Trial

On the first day of trial, the trial court heard testimony from Burnside, Katherine Smith (a permanency supervisor with the Department), Tayland Glover (a permanency specialist with the Department), Amanda Spharler (an employee of

---

[7]The bulk of the trial occurred on March 24, 2021. [2RR 1] The trial continued on April 5, 2021, when the trial court interviewed the three oldest children. [3RR 1]

6

CASA of Tarrant County), Mother, and a foster father to Amber, Aubrey, and Joey—the three youngest children. On the second day of trial, the trial court interviewed the three oldest children—Gabby, Alex, and Harry.

### 1. Mother and Father

Mother and Father professed love for their children. And the three oldest children expressed an affinity for their parents and a desire to stay with them. But one Department witness testified that the three youngest children did not respond well to Mother and appeared detached from her, describing the visits Mother had with them as "very poor."

The Department's investigation and subsequent dealings with Mother show that Mother had drug-use issues, mental-health issues, and had been in multiple domestic-assault situations with Father. Because of these concerns, a service plan was developed for Mother. Under the plan, Mother was to complete a substance-abuse assessment, engage in individual counseling, address domestic violence in the individual counseling, and complete a mental-health evaluation. She also needed to demonstrate the ability to maintain stable housing and stable employment, as well as visit the children regularly and submit to random drug tests. According to the Department's witnesses, Mother did not complete any of these services.

Mother's inability to follow her service plan was apparent almost immediately. For example, while the children were still placed with Father, Mother moved out of Second Cousin's house, went to Father's home where the children were residing, and

initially refused to leave—breaking the safety plan that was put into place soon after the children's removal. Mother told a Department worker that she and Father had gotten into an altercation that day and that he had broken her phone. Mother alleged that she left Second Cousin's house and returned to Father's because she was having problems with Second Cousin, so Mother eventually agreed to go to a shelter, but Mother left the shelter and returned to Second Cousin's house in less than a day.

Throughout the pendency of this case, other than a couple of brief stints with Catholic Charities and Christian Works, Mother never engaged in individual counseling. Mother rarely submitted to drug tests, and when she did, she often tested positive for methamphetamines, including positive drug tests in January 2021 and March 2021. Mother admitted to a caseworker that methamphetamine was her drug of choice and that she was often "struggling with her addiction."

Mother also never took her psychological assessment. Although Mother did get a part-time job in October or November of 2020 and was alleged to be employed at the time of trial, she never provided paycheck stubs or proof of permanent employment to any of her caseworkers. Mother only visited the children roughly 60 or 70 percent of the time, and she was often late to the visitations she did attend. And once during the pendency of the case, Mother was cited for domestic violence and taken to John Peter Smith Hospital for a three-day psychiatric hold. Another time during the pendency of the case, Mother reported that she was homeless. At the

time of trial, Mother lived in an apartment, but her name was not on the lease, the people leasing the apartment had moved away, and Mother was facing removal.

Mother testified that she knew the case had been going on for almost a year at the time of trial. She said that she desired the children be placed with Second Cousin in California while she attempted to complete her services. She also claimed that she and Father were now separated. According to Mother, the reason she would miss visitations was because of her lack of transportation, her lack of employment, and because the Department would not assist her. She alleged that she had begun working toward the end of November 2020 cleaning houses and testified that she was employed at Family Dollar. Mother claimed she was unable to complete her services or regularly attend visitation because of her lack of resources and complications from the COVID pandemic.

Mother claimed that she had attended counseling at Catholic Charities and Christian Works, and she said she was still going at the time of trial. Mother professed love for all her children. And she said that she had always watched out for her children, made sure they did well in school, and participated in their athletics' programs. Mother blamed her inability to perform her services on the lack of assistance from the Department, even stating that the Department was trying to make her look like a bad mother. She said she was always at her visitations but often was late, and the Department would cancel the visits. Mother implied that she had

remained sober during the pendency of this case, and she had no explanation for why two of her children had tested positive for methamphetamines.

Concerning Father, the Department put on evidence that Father was convicted of assault causing bodily injury to a family member in March 2019. Although Father did complete some of his services, which were similar to Mother's except he also was to attend the Batterers Intervention Prevention Program (BIPP), his ability to complete those services stopped around August 2020 when he was arrested on a separate domestic-violence charge.[8] At the time of trial, Father remained in jail on that pending charge and was facing immigration consequences. But even when Father was attempting to complete his services, he never provided proof of stable housing or pay stubs. A caseworker did speak with someone who claimed to be Father's employer, but the caseworker was unable to ascertain details regarding hours worked or income. As to drug use, Mother told a Department caseworker that Father used drugs, and Father refused to take a drug test. Father admitted to a caseworker that he had refused the drug test because he had used marijuana and had used methamphetamine with Mother.

---

[8]The record reflects that Mother and Father got into a domestic-violence event in August 2020, the police were called, and Father was arrested on an outstanding domestic-violence warrant for a June 2020 incident.

## 2. The Three Youngest Children—Amber, Aubrey, and Joey

After attempts to place the six children together, because of the children's respective ages, the three youngest children and the three oldest children were separated.

According to the Department's witnesses, the three youngest children were in a "dual licensed adoption-motivated home." One caseworker testified that the foster parents were loving and caring toward the three youngest children and they went "above and beyond to ensure the children receive[d] . . . medical and dental [care]," as opposed to when the kids came into care and "had very poor hygiene." The foster parents had enrolled the children in academic programs to help them get caught up because when they came into care, "they were severely behind academically." According to testimony, the three youngest children were "thriving," and the foster parents were able to meet the children's physical, emotional, and financial needs in the future. Amber and Aubrey were now making good grades and "excelling in school." The Department's plan was for the three youngest children to be adopted by the foster family. The foster family had agreed to allow post-adoption contact among the six siblings.

Foster Father testified that the three youngest children had been in his and his wife's home continuously for the ten months prior to trial. According to Foster Father, the children were "doing fantastic." Foster Father described the transformation of the children, most specifically Amber, under foster care:

11

> Emotionally when they came into our care, especially [Amber], the oldest of the three youngers, was very introverted. She showed signs of extreme anxiety. One of the shocking things that she said more than once was that people made her nervous. That was early on. Now, she has become very outgoing. She's making friends on her own. She's got multiple friends in the neighborhood. So a huge difference in her ability to interact with other people since coming into our care.

Foster Father said that he and his wife "[v]ery much so" had an interest in adopting the three youngest children.

### 3. The Three Oldest Children—Gabby, Alex, and Harry

The three oldest children were living in a general residential child-care facility at the time of trial. According to one caseworker, Gabby was in band and doing well. Alex was doing well in school, going to therapy once a week, and was on medication for mood and sleeping issues and responding well to treatment. Harry was also doing well in school. Although described as doing well in their current placement, the three oldest children were not in an adoption-motivated foster home given their ages—by the time of trial, Gabby was two months away from aging out at eighteen.

The three oldest children were interviewed by the trial court judge. In response to a question concerning how he felt about Mother's parental rights being terminated, Harry said that he wished the court would give Mother more time to complete her services because Mother had been "having troubles, like, with phones and cars . . . stuff like that." He also said that he would like to stay with Mother and that she had never hurt him. By Harry's account, he had visited with Mother via Zoom the week prior to trial.

As to his relationship and desires regarding Father, Harry said that he had been having phone conversations with Father twice a week. Harry stated that he had a good relationship with Father, that he liked being around Father, and that he wanted to continue to see him. Harry asserted that Father was doing his services, but that because Father went to jail, he did not get the chance to complete them. It was Harry's understanding that he and his siblings had been "taken away" by the Department because of Mother and Father arguing "and stuff like that." Harry said that Father had never struck him and that he felt safe around Father. Harry described Father as "a good dad." According to Harry, he was not afraid that Father would hurt Mother. Harry said that he was doing well in school and making As and Bs in his classes. But he said that he was happier when he lived with Mother and that he had a good relationship with all of his siblings.

Gabby testified that she was doing well in high school making As, Bs, and Cs, and that she expected to graduate by the end of the following year. Gabby said that she did not think it was fair that Father's parental rights could be terminated because he was unable to complete his services in jail. She expressed confidence that Father could provide for all of the siblings. Gabby voiced a desire that the court let Mother have more time to complete her services, citing that Mother was now employed and looking for a bigger home for the family. According to Gabby, she was not afraid of either parent and neither parent had ever hurt her. She said she had never seen her

parents do drugs or hurt each other. Gabby wished to be returned to her parents, and she wanted to live with all of her siblings.

Alex testified that it was his desire to live with Mother and Father and that he too was asking the court to give his parents more time to complete their services. Alex stated that he had a relationship with his younger three siblings and that he would like to see all the children remain with Mother and Father. Alex said he was doing okay in school. He also said that he had never seen his parents do illegal drugs in the family's home and that he had never seen any violence in the family's home.

### 4. Recommendations

A caseworker testified that the Department was asking the court to terminate parental rights to both Mother and Father for all six children and that the Department believed it was in their best interests given Mother's continued drug use, her mental health issues, and ongoing domestic violence between the parents. Further, according to the Department, Mother had not shown she could parent all six children due to her lack of income and employment. The Department also cited that Father was currently in jail for domestic violence, was less than forthcoming about his own drug use, and was on a two-year-immigration hold.

CASA representative Spharler said that she was familiar with the children's case and that it was CASA's recommendation to terminate both parents' rights as to the three youngest children. Spharler mentioned that the three youngest children were doing very well in their current placement, that they did not have a significant

14

relationship with their biological parents, and that Mother and Father had not completed their services. As to the three oldest children, Spharler said that CASA recommended that Mother's and Father's parental rights not be terminated and that the Department be appointed their permanent managing conservator. The children's attorney ad litem said that his recommendation was consistent with CASA's.

### 5. The Trial Court's Ruling

The trial court found by clear and convincing evidence that termination of Mother's and Father's parental rights to Amber, Aubrey, and Joey was in the children's best interest and that the Department had established by clear and convincing evidence the conduct grounds under Subsection (D) (endangering environment), (E) (endangering conduct), (N) (constructive abandonment), (O) (failing to complete service plan), and (P) (use of a controlled substance). *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E), (N), (O), (P), (b)(2). The trial court thus terminated Mother's and Father's parental rights to the three youngest children and appointed the Department as their permanent managing conservator. As to the three oldest children, the trial court appointed Mother and Father their possessory conservators and the Department as permanent managing conservator.

### 6. Mother and Father Appeal

Mother and Father have both timely filed a notice of appeal. Neither parent appeals the trial court's ruling regarding the three oldest children. Mother challenges the trial court's ruling on her motion for continuance and the trial court's best-interest

15

findings regarding the three youngest children.  Father challenges only the trial court's best-interest findings regarding the three youngest children.

## III.  DISCUSSION

### A.  Mother's Motion for Continuance

In her first issue, Mother argues that the trial court abused its discretion by denying her motion for continuance.  Much like she argued in the trial court, Mother contends that she was prevented from completing her services and securing Aunt as a certified placement for the children because of the COVID pandemic.

We review a trial court's ruling on a motion for continuance for an abuse of discretion.  *See BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 800 (Tex. 2002). We do not substitute our judgment for that of the trial court.  *In re Nitla S.A. de C.V.*, 92 S.W.3d 419, 422 (Tex. 2002) (orig. proceeding).  Instead, we must determine whether the trial court's action was so arbitrary and unreasonable as to amount to a clear and prejudicial error of law.  *Joe v. Two Thirty Nine Joint Venture*, 145 S.W.3d 150, 161 (Tex. 2004).

As a preliminary matter, we note that Mother's motion for continuance was not verified or supported by affidavit.  As pointed out by the Department, Rule 251 of the Texas Rules of Civil Procedure requires that a motion for continuance be verified or supported by an affidavit.  Tex. R. Civ. P. 251; *see Serrano v. Ryan's Crossing Apartments*, 241 S.W.3d 560, 564 (Tex. App.—El Paso 2007, pet. denied).  "If the motion is not verified or supported by affidavit, we presume the trial court did not abuse its

discretion" by denying it. *Serrano*, 241 S.W.3d at 564 (citing *Sw. Country Enters., Inc. v. Lucky Lady Oil Co.*, 991 S.W.2d 490, 493 (Tex. App.—Fort Worth 1999, pet. denied)). Thus, because Mother's motion for continuance was not verified or supported by affidavit, we cannot say that the trial court abused its discretion by denying it.

Putting aside the lack-of-verification issue, when a parent, through his or her own choices, fails to comply with a service plan, and then at the time of the termination trial requests a continuance in order to complete the plan, the trial court does not abuse its discretion by denying the continuance. *See In re K.P.*, No. 2-09-028-CV, 2009 WL 2462564, at *4 (Tex. App.—Fort Worth Aug. 13, 2009, no pet.) (mem. op.); *In re M.M.F.*, No. 02–08–014–CV, 2008 WL 5265033, at *13 (Tex. App.—Fort Worth Dec. 18, 2008, no pet.) (mem. op.). Here, even though the order setting the trial date for March 24, 2021, was signed on January 12, 2021, Mother did not file her motion for continuance until March 22, 2021, two days before trial. Also, the record establishes that Mother agreed to participate in her service plan in April and May of 2020, ten to eleven months prior to trial. Part of her services included that she attend drug counseling and not test positive for illegal substances such as methamphetamines—the very substance that Joey tested positive for at birth. The record further reveals that Mother tested positive for methamphetamines in January 2021 and March 2021—shortly before the trial began on March 24, 2021. When questioned about her drug use at the continuance hearing on the morning of trial, Mother gave evasive answers.

17

As to Mother's contention that she needed more time so that Aunt could be a placement for the children, the record shows that the Department was wary of placing the children with Aunt given her past felony conviction involving drug trafficking. Also, Aunt, despite being contacted by the Department shortly after the children had been removed, admittedly failed to provide a childcare budget for the Department. And Aunt was one of three people living in her two-bedroom apartment, a home Aunt admitted she had been told would not be adequately sized to have the children placed with her.

Under these facts, we cannot conclude that the trial court abused its discretion by denying Mother's motion for continuance.[9] *See In re K.P.*, 2009 WL 2462564, *4 (holding that trial court did not abuse discretion by denying a mother's motion for continuance when eleven months into case mother had not completed her services and had tested positive for drugs fifty days prior to trial date). We overrule Mother's first issue.

---

[9]We likewise reject Mother's argument that the COVID pandemic necessitated a continuance in this case. *See In re A.L.H.*, No. 04-20-00452-CV, 2021 WL 1110612, at *2 (Tex. App.—San Antonio Mar. 24, 2021, pet. denied) (mem. op.) (holding trial court did not abuse its discretion by denying continuance during COVID pandemic when appellant's motion for continuance was not supported by affidavit, and appellant relapsed after release from drug-treatment program).

## B. Best-Interest Findings

In Mother's second issue and Father's sole issue, they challenge the trial court's findings that termination of their respective parental rights to Amber, Aubrey, and Joey was in each of the children's best interest. Both Mother and Father argue that the trial court could not have made these findings and at the same time have allowed them to remain possessory conservators as to the three oldest children. We disagree.

### 1. Standard of Review Generally

In a termination case, the State seeks not just to limit parental rights but to erase them permanently and—except for the child's right to inherit—to divest the parent and child of all legal rights, privileges, duties, and powers normally existing between them. Tex. Fam. Code Ann. § 161.206(b); *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). Thus, "[w]hen the State seeks to sever permanently the relationship between a parent and a child, it must first observe fundamentally fair procedures." *In re E.R.*, 385 S.W.3d 552, 554 (Tex. 2012) (citing *Santosky v. Kramer*, 455 U.S. 745, 747–48, 102 S. Ct. 1388, 1391–92 (1982)).

Clear and convincing evidence must support the decision to terminate. *See* Tex. Fam. Code Ann. §§ 161.001(b), .206(a); *In re E.N.C.*, 384 S.W.3d 796, 802 (Tex. 2012). Because "[a] parental rights termination proceeding encumbers a value 'far more precious than any property right,'" due process demands this heightened standard. *E.R.*, 385 S.W.3d at 555 (quoting *Santosky*, 455 U.S. at 758–59, 102 S. Ct. at 1397). To be clear and convincing, evidence must "produce in the mind of the trier

19

of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007; *E.N.C.*, 384 S.W.3d at 802.

For a trial court to terminate a parent–child relationship, the party seeking termination must establish, by clear and convincing evidence, that (1) the parent's actions satisfy just one of the many predicate grounds listed in Family Code Section 161.001(b)(1), and (2) termination is in the child's best interest under Section 161.001(b)(2).[10] Tex. Fam. Code Ann. § 161.001(b)(1), (2); *E.N.C.*, 384 S.W.3d at 803; *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005).

## 2. Legal Sufficiency

When evaluating the evidence for legal sufficiency in termination cases, we determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that the Department proved that termination is in the child's best interest. *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002); *see In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). We review all the evidence in the light most favorable to the findings and judgment, and we resolve any disputed facts in favor of the findings if a reasonable factfinder could have done so. *J.F.C.*, 96 S.W.3d at 266. We consider evidence favorable to termination if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *See id.* In doing our job, we must recognize that weighing a witness's credibility is the factfinder's province, not

---

[10]Mother and Father do not challenge the findings of predicate grounds for termination, but they challenge the trial court's best-interest findings.

ours. *J.P.B.*, 180 S.W.3d at 573. And even when credibility issues appear in the appellate record, we defer to the factfinder's determinations provided they are not unreasonable. *Id.*

### 3. Factual Sufficiency

We must perform "an exacting review of the entire record" when determining whether the evidence is factually sufficient to support terminating a parent–child relationship. *In re A.B.*, 437 S.W.3d 498, 500 (Tex. 2014). In a factual-sufficiency review, we give due deference to the factfinder's findings and do not supplant those findings with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We determine whether, on the entire record, a factfinder could reasonably form a firm belief or conviction that termination is in the child's best interest. Tex. Fam. Code Ann. § 161.001(b); *see In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002). If, in light of the entire record, the disputed evidence is so significant that a factfinder could not reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient. *H.R.M.*, 209 S.W.3d at 108.

### 4. The *Holley* Factors

There is a strong presumption that keeping a child with a parent is in the child's best interest. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). We review the entire record to determine the child's best interest. *In re E.C.R.*, 402 S.W.3d 239, 250 (Tex. 2013). Evidence that is probative of the predicate grounds under Section 161.001(b)(1) may also be probative of best interest under Section 161.001(b)(2). *Id.*

at 249; *C.H.*, 89 S.W.3d at 28.  Nonexclusive factors that the factfinder in a termination case may also use in determining the child's best interest include:

- the child's desires;

- the child's emotional and physical needs now and in the future;

- the emotional and physical danger to the child now and in the future;

- the parental abilities of the individuals seeking custody;

- the programs available to assist these individuals to promote the child's best interest;

- the plans for the child by these individuals or by the agency seeking custody;

- the stability of the home or proposed placement;

- the parent's acts or omissions that may indicate that the existing parent-child relationship is not a proper one; and

- the parent's excuse, if any, for the acts or omissions.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *see E.C.R.*, 402 S.W.3d at 249; *E.N.C.*, 384 S.W.3d at 807.  These factors do not form an exhaustive list, and some factors may not apply to some cases.  *C.H.*, 89 S.W.3d at 27.  Furthermore, undisputed evidence of just one factor may suffice in a particular case to support a finding that termination is in the child's best interest.  *Id.*  On the other hand, the presence of paltry evidence relevant to each factor will not support such a finding. *Id.*; *In re C.G.*, No. 02-20-00087-CV, 2020 WL 4518590, at *7 (Tex. App.—Fort Worth Aug. 6, 2020, pet. denied) (mem. op.); *In re J.B.*, No. 02-18-00034-CV, 2018 WL 3289612, at *4 (Tex. App.—Fort Worth July 5, 2018, no pet.) (mem. op.).

### 5. Analysis of the *Holley* Factors

*As to the children's desires*, Amber, Aubrey, and Joey (who was only eleven months old at the time of trial) did not testify. A Department caseworker, however, when discussing the three youngest children and the foster parents, testified that "[t]he children ha[d] expressed to [her] their desire to stay where they're placed." Even so, "a child's preference should not be considered absent a showing of sufficient maturity," *In re D.W.*, 445 S.W.3d 913, 926 (Tex. App.—Dallas 2014, pet. denied), and there was no showing that the three youngest children were sufficiently mature to express a preference as to their placement. There is, however, evidence in the record that Amber, Aubrey, and Joey were not bonded to Mother and that her visits with them were "very poor." Thus, this factor weighs slightly in favor of the trial court's best-interest findings as to Mother, and this factor weighs neither in favor of nor against the trial court's best-interest findings as to Father. *See E.N.C*, 384 S.W.3d at 808.

*Concerning the children's emotional and physical needs now and in the future and the emotional and physical danger to the children now and in the future*, the record reflects that Mother suffered from unaddressed mental-health issues.[11] Indeed, the Department

---

[11]Notably, neither Mother nor Father challenged the trial court's predicate findings under 161.001(b)(1)(D) and (E). *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D) (termination appropriate when parent has knowingly placed or knowingly allowed the child to remain in conditions or surroundings that endanger the physical or emotional well-being of the child), (E) (termination appropriate when

first became involved because Mother had set the room she was in on fire even though she was pregnant and other children were in the house. Mother's explanation for starting the fire was that "she was having some issues with [Father] and . . . was tired and that she wanted to basically die." During the pendency of this case, Mother was involved in a domestic dispute with Father and placed in the hospital on a three-day psychiatric hold. Mother did not complete personal counseling; she never went to any type of counseling for domestic abuse; she struggled with methamphetamine addiction; and she never took a psychological assessment. This behavior by Mother exposed Amber, Aubrey, and Joey to emotional and physical dangers. Indeed, both Joey and Amber tested positive for amphetamines and methamphetamines. And Mother's lack of effort to resolve the issues led to the conclusion that if the children stayed in her care, they would continue to be exposed to these behaviors, meaning their emotional and physical needs would be in danger in the future if Mother's parental rights were not terminated.

Father was in jail at the time of trial because of a domestic-violence charge and had shown a propensity in the past to commit domestic violence. Because of his domestic-violence charge, Father was facing immigration consequences. He also demonstrated the propensity to use illicit drugs. These behaviors by Father also exposed Amber, Aubrey, and Joey to emotional and physical dangers. And even

parent has engaged in conduct or knowingly placed the child with persons who engaged in conduct that endangers the physical or emotional well-being of the child).

24

though Father attempted to complete his services, he was jailed due to a domestic-violence charge and unable to complete them. Father's ability to sabotage his efforts to correct his behaviors shows that the three youngest children's emotional and physical needs in the future would also be in danger if Father's parental rights were not terminated.

Moreover, when the three youngest children were first placed in the foster home, they had very poor hygiene, demonstrating that their physical needs had previously been in danger. In contrast, in their current placement, they are housed with a family that was described as going "above and beyond" what was necessary to provide the children with their medical and dental-care needs. When Amber and Aubrey arrived in foster care, they were behind academically, but then they enrolled in academic programs and did well. And when Amber first arrived in foster care, she was introverted and nervous around others, but then she became outgoing and made her own friends.

These examples serve as more evidence that it is proper that Mother's and Father's parental rights should be terminated and that the children's emotional and physical needs in the future be met by the foster family. Additionally, neither Mother nor Father demonstrated an ability to provide a stable living environment or the ability to maintain stable employment to provide for the physical needs of the children.

In short, the evidence casts doubt on the parents' ability to (1) understand their children's needs and provide for the emotional and physical needs now and in the future and (2) understand and recognize the emotional and physical danger to the children now and in the future. This factor weighs in favor of the trial court's best-interest findings.

*Regarding the parental abilities of the individuals seeking custody*, the evidence showed that Mother and Father love their children. However, the evidence also showed that Mother did not complete parenting classes, individual counseling, or drug-abuse-assistance programs. And the record further reflected that Father was unable to complete his services due to being in jail for a domestic-violence charge. Moreover, Mother attended only 60% or 70% of her visitations, she was often late, and her interactions with the three youngest children when she did attend visitations were described as "very poor." Father's visitations were limited by his incarceration. In contrast, the foster parents have provided the three youngest children with an environment that has allowed their psychological and educational situation to improve. This factor weighs in favor of the trial court's best-interest findings.

*With respect to the programs available to assist these individuals to promote the children's best interest*, multiple caseworkers testified about Mother's failure to complete her services. And Father could not complete his, including BIPP, which was paramount to Father given his propensity for domestic violence. This factor weighs in favor of the trial court's best-interest findings.

26

*As to the parents' and the Department's plans for the children*, the record demonstrates that Mother's plan was to place the children with Aunt who had a past felony associated with drug trafficking, who lived in a house inadequate to accommodate the children, and who had made little effort to demonstrate the ability to be a placement for the children. Aunt even failed to provide the Department with the required childcare budget. The Department's plan was to leave the children with the foster parents, who were adoption motivated and with whom the children had improved physically, emotionally, and educationally. The foster family provided the children with medical and dental care, and they and the children had bonded with each other. This factor weighs in favor of the trial court's best-interest findings.

*Concerning the stability of the parents' home versus the proposed placement of the children*, Mother consistently demonstrated the inability to provide the children with a stable living environment. Indeed, at one time she was homeless, and at the time of trial, Mother was living in an apartment that was not leased in her name, the lessees had moved out, and she was facing removal. And Father was in jail, was facing immigration issues, and never provided the Department with proof of the ability to provide a stable living environment. In contrast, the children had been in a stable home since being placed with the foster parents shortly after being removed from Mother's and Father's care. This factor weighs in favor of the trial court's best-interest findings.

27

*Regarding the parents' acts or omissions that may indicate that the existing parent-child relationship is not a proper one*, the record reflects that the children were removed from Mother's care (1) because she had suicidal ideations and had set the room she was in on fire despite being pregnant and other children being in the house, and (2) because Joey tested positive for amphetamines and methamphetamines at birth, as well as Amber testing positive for amphetamines and methamphetamines. The children were removed from Father's care because he refused drug testing and admitted to marijuana and methamphetamine use. He also had a history of domestic violence and was jailed for a domestic-violence charge at the time of trial. Despite a service plan to assist Mother with both her emotional issues and drug addiction, Mother did not complete any of her services related to these issues, and she continually either failed to take drug tests or tested positive for methamphetamines when she did test. Even though Father attempted to complete his services, his jailing on a domestic-violence charge during the pendency of the case prevented him from doing so. These acts and omissions by Mother and Father indicated that the parent-child relationship between them and the three youngest children was not a proper one. This factor weighs in favor of the trial court's best-interest findings.

*With respect to any excuses for the parents' acts or omissions*, Mother blamed her failure for not completing her services on circumstances and the Department, and at times during trial, she evaded questions about her drug use. Father's excuse for not completing his services was that he was jailed on a domestic-violence charge during

28

the pendency of the case. The record reflects that he was arrested after police responded to a domestic-violence event between him and Mother in August 2020, and police found that he had an outstanding domestic-violence warrant for a June 2020 incident. This factor weighs in favor of the trial court's best-interest findings.

Citing divorce cases dealing with the possible separation of siblings and public policy against separation, Mother and Father argue that the trial court could not have made the best-interest findings supporting termination of their parental rights as to the three youngest children but at the same time not have terminated their rights to the three oldest children. *See Coleman v. Coleman*, 109 S.W.3d 108, 113 (Tex. App.—Austin 2003, no pet.); *Autry v. Autry*, 350 S.W.2d 233, 236 (Tex. App.—El Paso 1961, writ dism'd). But Mother's and Father's reliance on this line of cases is misplaced. Indeed, it is not at all uncommon for a trial court to terminate parental rights to some children and not terminate parental rights to other children. *See In re K.E.*, No. 02-20-00045-CV, 2020 WL 4360493, at *2 (Tex. App.—Fort Worth July 30, 2020, pet. denied) (mem. op.) (affirming trial court's order terminating a mother's parental rights to three youngest children and naming mother as possessory conservator of oldest child); *In re J.O.A.*, 262 S.W.3d 7, 14 (Tex. App.—Amarillo 2008) (affirming portion of trial court's order terminating parental rights regarding two of mother's children but not terminating parental rights as to mother's third child), *aff'd as modified and remanded*, 283 S.W.3d 336 (Tex. 2009).

Father argues that the trial court's judgment is inconsistent because the "same set of applicable facts as to the parents and situation as a whole" apply to both the three youngest children and the three oldest children. This is incorrect for a number of reasons. First, the three oldest children were able to express their desires to the trial court, but the three youngest children were not. Second, the three youngest children were placed in an adoption-motivated home where the foster parents care for the three youngest children's emotional and physical needs, while the three oldest children (one of whom was two months away from aging out of the Department's system at the time of trial) were placed in a general residential child-care facility and finding them an adoption-motivated placement was unlikely. Third, two of the younger children (Amber and Joey) tested positive for amphetamines and methamphetamines, but there was no evidence that any of the three oldest children tested positive for any illegal substances. In addition to these factual differences, it is important to point out that the trial court did not place the three oldest children in the care of either Mother or Father. Instead, the trial court named the Department permanent managing conservator of the three oldest children and named both parents possessory conservators but limited the parents' access to the three oldest children to supervised visitations only. And despite Mother's argument that Foster Father did not testify that the foster parents would allow access among the six siblings, a caseworker did testify that the foster parents intended to allow the siblings to see each other. On this record, we conclude that Mother's and Father's contention that the

30

trial court could not have terminated their parental rights as to the three youngest children but at the same time appoint them as possessory conservators as to the three oldest children is without merit.

### 6. Conclusion Regarding the Best-Interest Findings

We conclude that, viewing the evidence in the light most favorable to the trial court's best-interest findings, a reasonable factfinder could have formed a firm belief or conviction that termination of Mother's and Father's parental rights was in the three youngest children's best interest. *See* Tex. Fam. Code Ann. § 161.001(b)(2); *J.P.B.*, 180 S.W.3d at 573. We thus hold that the evidence is legally sufficient to support the trial court's best-interest findings. *See J.P.B.*, 180 S.W.3d at 573. And as to factual sufficiency, based on our review of the entire record and giving due deference to the trial court's best-interest findings, we conclude that the trial judge reasonably could have formed a firm belief or conviction that termination of Mother's and Father's parental rights was in the children's best-interest. *See* Tex. Fam. Code Ann. § 161.001(b)(2); *C.H.*, 89 S.W.3d at 18–19. We thus hold that the evidence is factually sufficient to support the trial court's best-interest findings. *See* Tex. Fam. Code Ann. § 161.001(b)(2); *C.H.*, 89 S.W.3d at 18–19. We overrule Mother's second issue and Father's sole issue.

## IV. CONCLUSION

Having overruled both of Mother's issues and Father's sole issue, we affirm the trial court's judgment.

/s/ Dana Womack

Dana Womack
Justice

Delivered: August 26, 2021